UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENN NATIONAL INSURANCE,<br>*as subrogee of Elam G.*<br>*Stoltzfus, Jr., Inc.,*<br>Plaintiff | : <br> : <br> : <br> : | **CIVIL NO. 1:05-CV-2096**<br><br>(Judge Jones) |
| v. | : <br> : | (Magistrate Judge Smyser) |
| | : | |
| HNI CORPORATION and<br>HEARTH & HOME TECHNOLOGIES,<br>INC., t/d/b/a FIRESIDE<br>HEARTH & HOME,<br>Defendants | : <br> : <br> : <br> : <br> : | |
| | : | |
| HEARTH & HOME TECHNOLOGIES,<br>INC. t/d/b/a FIRESIDE HEARTH<br>& HOME,<br>Third Party Plaintiff | : <br> : <br> : <br> : | |
| | : | |
| v. | : | |
| | : | |
| HOWARD HALDEMAN t/d/b/a<br>HALDEMAN CHIMNEY SWEEP,<br>Third Party Defendant | : <br> : <br> : | |
| | | |
| TRAVELERS PROPERTY CASUALTY<br>COMPANY OF AMERICA, a/s/o<br>DONECKERS, INC.,<br>Plaintiff | : <br> : <br> : <br> : | |
| | : | |
| v. | : | |
| | : | |
| HEARTH & HOME TECHNOLOGIES,<br>INC., d/b/a FIRESIDE HEARTH<br>& HOME, and HOWARD HALDEMAN,<br>d/b/a HALDEMAN CHIMNEY<br>SWEEP,<br>Defendants | : <br> : <br> : <br> : <br> : <br> : | |
| | : | |
| HEARTH & HOME TECHNOLOGIES,<br>INC. t/d/b/a FIRESIDE HEARTH<br>& HOME,<br>Third Party Plaintiff | : <br> : <br> : <br> : | |
| | : | |
| v. | : | |
| | : | |
| PENN NATIONAL INSURANCE,<br>Third Party Defendant | : <br> : | |

## REPORT AND RECOMMENDATION

I. Background and Procedural History.

This consolidated case arises out of a fire that occurred in a model home.

A. Penn National Case.

Penn National Insurance, as subrogee of Elam G. Stoltzfus, Jr., Inc., filed a complaint in the Court of Common Pleas of Cumberland County, Pennsylvania.  The complaint names as defendants HNI Corporation and Hearth & Home Technologies, Inc. t/d/b/a Fireside Hearth and Home.

Penn National alleges that Elam G. Stoltzfus, Jr., Inc. (Stoltzfus) was the owner of property known and numbered as 1735 Eliza Way in the Pinehurst Hills Development in Mechanicsburg, Pennsylvania.  The structure on the property was a two-story, single-family home.  Penn National alleges that construction of the home was completed on or about September 15, 2004 and that the home was not occupied or under a sales contract.  The home was used as a model home.  Stoltzfus was

2

the holder of a policy of insurance, issued by Penn National, which covered the property.

Penn National alleges that the defendants are in the business of manufacturing and installing indoor gas burning fireplaces and that Stoltzfus entered into a contract with the defendants for the delivery and installation of two gas fireplace systems.

On October 1, 2004 a fire occurred at the home which resulted in substantial destruction of the house and its contents.  Penn National alleges that the cause of the fire was the improper installation and assembly of the chimney vent pipe for the fireplace located in the family room of the home.

Penn National's complaint contains two counts.  Count I is a negligence claim.  Count II is a breach of contract claim.

On October 14, 2005, the defendants removed the case to this court.

On October 21, 2005, defendant HNI corporation filed an answer to the complaint.

Also on October 21, 2005, defendant Hearth and Home Technologies, Inc. (Hearth and Home) filed an answer to the complaint and a counterclaim against Penn National.

In its counterclaim against Penn National, Hearth and Home alleges that it subcontracted with Howard Haldeman, t/d/b/a Haldeman Chimney Sweep (Haldeman) to install the fireplaces at the Stoltzfus property.  Hearth and Home alleges that, as part of an Independent Contractor Agreement, Haldeman was required to indemnify and defend it with respect to any claims arising from Haldeman's work, including the work at the Stoltzfus property.  Haldeman was the holder of a Commercial General Liability policy of insurance issued by Penn National, which was in effect at the time of the fire on October 1, 2004. Hearth and Home contends that as an indemnitee of Haldeman it is entitled to coverage and a defense by Penn National under the Haldeman policy.  Penn National, however, has refused to defend or indemnify Hearth and Home.

Hearth and Home's counterclaim against Penn National contains three counts.  Count I is a breach of contract claim. Count II is a claim for breach of the covenant of good faith and fair dealing.  Count III requests a declaratory judgment declaring: that Penn National is under a duty to defend Hearth

and Home in the action filed by Penn National as subrogee of
Stoltzfus and in the action filed by Travelers Insurance as
subrogee of Doneckers, which had furnished the model home; that
Penn National and Haldeman are required to indemnify Hearth and
Home for any and all sums recovered in either the case brought
by Penn National or the case brought by Travelers; and that
Penn National acted in bad faith in denying Hearth and Home
coverage and a defense.

Also on October 21, 2005, Hearth and Home filed a
third-party complaint against Haldeman.  The third-party
complaint contains three counts.  Count I is a claim for
contribution.  Count II is a claim for indemnification.  Count
III is a claim for breach of contract.

B. Travelers Case.

On April 10, 2006, Travelers Property Casualty Company
of America (Travelers), as subrogee of Doneckers, Inc., filed a
complaint against Hearth and Home and Haldeman.

Travelers alleges that Doneckers was in the furniture
business and had furnished the model home.  Travelers insured

Doneckers and paid Doneckers for damages sustained by Doneckers as a result of the fire.

Travelers' complaint contains two counts.  Count I is a negligence claim against Hearth and Home.  Count II is a negligence claim against Haldeman.

On April 24, 2006, Haldeman filed an answer to Travelers' complaint and a cross-claim against Hearth & Home for contribution and indemnification.

On May 3, 2006, Hearth and Home filed an answer to Travelers' complaint and a cross-claim against Haldeman for contribution and indemnification.

On May 10, 2006, Hearth & Home filed a third-party complaint against Penn National.  Hearth and Home's third-party complaint contains the same three counts as are set forth in its cross-claim against Penn National in the case brought by Penn National.

C. Consolidation and Pending Motions.

By an Order dated August 16, 2006, the Travelers case was consolidated with the Penn National case.  The consolidated case is on Judge Jones' June 2007 trial list.[1]

There are six motions for summary judgment pending: 1) Travelers' motion (doc. 67) for partial summary judgment against Hearth and Home; 2) Penn National's motion (doc. 62) for summary judgment against Hearth and Home on its claims as the subrogee of Stoltzfus; 3) Haldeman's motion (doc. 64) for summary judgment or, in the alternative, partial summary judgment against Hearth and Home; 4) Hearth and Home's motion (doc. 70) for summary judgment against Haldeman; 5) Penn National's motion (doc. 76) for summary judgment against Hearth and Home on Hearth and Home's counterclaims/third-party claims against Penn National; and 6) Hearth and Home's motion (doc. 73) for summary judgment against Penn National on Hearth and Home's counterclaims/ third-party claims against Penn National.

-----

[1] On January 26, 2007, Haldeman filed a motion to continue the trial.  Since any continuance of the trial date will impact Judge Jones' schedule, we will assume, unless informed otherwise, that Judge Jones will address the motion to continue the trial.

The motions for summary judgment have been briefed and will be addressed in this Report and Recommendation.

II.   Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).   "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, though the non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir. 2001); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 580 (3d Cir. 2003).   In determining whether an issue of material fact exists, the court must consider all evidence in

the light most favorable to the non-moving party.  *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). "Our function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).

III.  Travelers' Motion for Partial Summary Judgment against Hearth and Home.

        Travelers, as subrogee of Doneckers, is seeking summary judgment against Hearth and Home on Travelers' negligence claim against Hearth and Home.  Travelers is seeking judgment in the amount of $100,353.11, the amount that it paid to Doneckers based upon Doneckers' loss of furniture in the fire.

        It is undisputed that Stoltzfus owned the property and model home at issue, that Doneckers furnished the model home, and that on October 1, 2004, a fire occurred at the model home. *See Travelers' Statement of Material Facts at ¶¶1-3 & 8 and Defendant Hearth and Home Technologies Inc.'s Response to Plaintiff Travelers Property Casualty Company of America's Concise Statement of Material Facts at ¶¶1-3 & 8.*

9

Travelers contends that the fire occurred because the flue pipe assembly serving the fireplace in the family room was not installed correctly and utilized improper connection details.

Hearth and Home contends that it subcontracted with Haldeman to install the fireplace system including the vent pipe and that Haldeman was responsible for all work performed with respect to the fireplace unit and vent pipe. It is not disputed, however, that, in addition to Haldeman, Cort Miller, Ken Sharpe and Floyd Wertz, employees of Hearth and Home, were present when the fireplace was installed and assisted in the installation in varying degrees. Id. at ¶5.

It is also undisputed that Dennis Brubaker, an employee of Hearth and Home, had traveled to the model home on two different occasions but was unable to start the fireplace. *Id. at ¶6.* It is further undisputed that Joe LaFrance, an employee of Hearth and Home, had traveled to the model home on September 16, 2004 and was able to start the fireplace. *Id. at ¶7.* LaFrance, however, could not keep the fireplace burning for any length of time. *Doc. 80, Exhibit E - LaFrance Dep. at 79.*[2]

---

[2] Hearth and Home disputes that the fireplace was not operating properly upon LaFrance's departure. However, Hearth and Home has not pointed to any record evidence to support its

Travelers cites to the report of its expert and the report of Penn National's expert in support of its contention that the fire occurred because the flue pipe assembly serving the fireplace was not installed correctly and utilized improper connection details.  Both Travelers' and Penn National's experts opine that there was a gap between two pieces of pipe forming the flue which allowed hot gases to come into contact with combustible materials causing the fire. *See Doc. 47 - Popolizio Report and Doc. 44 - Kufta Report.*  Travelers' expert also opines that a loose-fitting, cylindrical, metal sleeve, slip connector that was used around the flue would not have properly protected combustible materials during the use of the fireplace. *See Doc. 47 - Popolizio Report.*  Travelers argues that Hearth and Home has not offered any evidence or an expert report to counter its assertion that the fireplace was negligently installed and that, therefore, Travelers should be granted summary judgment as against Hearth and Home.

---

assertion that the fireplace was operating properly.  Hearth and Home cites pages 35 and 39 of testimony of someone that it identifies as Stoltzfus's corporate representative. *See Doc. 97 at* ¶7. Hearth and Home has not identified the name of the corporate representative to whom it is referring.  From the documents submitted, it appears to the court that Stoltzfus' corporate representative could be either David Albright or Stacy Fahnestock. However, Hearth and Home has not submitted pages 35 or 39 of the deposition of either Albright or Fahnestock.

Hearth and Home has not submitted an expert report regarding the cause of the fire.  However, relying on the expert report submitted by Haldeman, Hearth and Home argues that there is a material factual dispute about the cause of the fire and that, therefore, Travelers is not entitled to summary judgment.

In contrast to Travelers' expert, Haldeman's expert concludes that the flue pipes were snapped together and that the joint inside the attic insulation shield was affixed prior to the fire and became separated as a result of the collapse of the building from the fire. *See Doc. 50 - Carey Report.* Haldeman's expert contends that the roof flashing and vent cap for the fireplace were never installed by Hearth and Home and that without those components the fireplace was not ready to start-up and was not safe to operate. *Id.*  He contends that despite the fact that the fireplace was not complete and was not ready to be started, Hearth and Home sent its employees (Brubaker and LaFrance) to start the fireplace. *Id.*  Haldeman's expert concludes that the actions performed by Brubaker and LaFrance, in their attempts to start up the fireplace, and their failure to recognize that the installation was incomplete and unsafe, created an obvious fire hazard and that the work performed by LaFrance resulted in the activation of an unsafe

fireplace that was an obvious fire hazard. *Id.*  He concludes
that the heat released from the incomplete system into the pipe
chase would have been adequate to ignite the combustible
material inside the pipe chase. *Id.*  Haldeman's expert also
concludes that the failure of Hearth and Home's office and
management personnel to coordinate the proper completion of the
installation of the fireplace system prior to start up of the
fireplace was a significant factor contributing to the fire.
*Id.*

Hearth and Home argues that Haldeman's expert report
creates a material question of fact as to the cause of the
fire.  Hearth and Home argues that if, as Haldeman's expert
opines, the fire was caused by the failure to vent the pipe
through the top of the pipe chase, then it was Stoltzfus, as
the general contractor responsible for supervising the
construction and insuring the completion of all work, that is
responsible.  Haldeman's expert, however, does not conclude
that Stoltzfus was responsible for completing the roof flashing
and vent cap.  On the contrary, Haldeman's expert contends that
Hearth and Home was responsible for failing to complete the
flashing and cap.  Hearth and Home cites to the deposition
testimony of David Albright, at the time a field superintendent
for Stoltzfus, for the proposition that Stoltzfus as the

general contractor was responsible for supervising the construction and insuring the completion of all work.  However, the pages of Albright's deposition cited by Hearth and Home do not support the proposition that Stoltzfus was responsible for ensuring completion of the fireplace system.  Although based upon the expert reports there is a question of fact about the exact cause of the fire, all of the experts agree that the fire was caused by either the negligent installation or the negligent start up of the fireplace.  Therefore, contrary to Hearth and Home's contention, summary judgment in favor of Travelers is not necessarily precluded on the basis that there is a question of fact about the cause of the fire.

Although summary judgment in favor of Travelers is not necessarily precluded on the basis that there is a question of fact about the cause of the fire, we nevertheless conclude that summary judgment should not be granted to Travelers.  Hearth and Home contends that Haldeman was an independent contractor, that it subcontracted with Haldeman to install the fireplace system including the vent pipe and that Haldeman was responsible for all work performed with respect to the fireplace unit and vent pipe.  As discussed below in the context of Haldeman's motion for summary judgment against Hearth and Home and in the context of Hearth and Home's motion

14

for summary judgment against Haldeman, there is a genuine

factual dispute about whether Haldeman was an independent

contractor or an employee of Hearth and Home.  If Haldeman was

an independent contractor and if his work was the cause of the

fire, then Hearth and Home would not be liable to Travelers.

*See Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781,

785 (3d Cir. 1978)("Under Pennsylvania law, when an injury is

done by an "independent contractor," the person employing him

is generally not responsible to the person injured.").

Accordingly, it will be recommended that Travelers' motion for

partial summary judgment against Hearth and Home be denied.


IV. Penn National's Motion for Summary Judgment against Hearth
    and Home on its Claims as the Subrogee of Stoltzfus.

        Penn National, as subrogee of Stoltzfus, is seeking

summary judgment against Hearth and Home as to Penn National's

negligence and breach of contract claims against Hearth and

Home.  Penn National is seeking judgment in the amount of

$559,373.70, the amount it paid to Stoltzfus pursuant to

Stoltzfus' policy of insurance with Penn National.


        It is undisputed that Stoltzfus owned the property and

model home at issue, that Stoltzfus was the holder of a policy

of insurance issued by Penn National which covered the

15

property, that on October 1, 2004, a fire occurred at the model home which severely damaged the model home and that Penn National paid Stoltzfus $559,373.70 pursuant to the insurance policy on the property. *See Penn National's Concise Statement of Material Facts at ¶¶1, 2, 7 & 8 and Defendant Hearth and Home Technologies Inc.'s Response to Plaintiff Penn National Insurance's Concise Statement of Material Facts at ¶¶1, 2, 7 & 8.*

Penn National contends that the fire occurred because the employees and/or contractors of Hearth and Home improperly installed the fireplace in the first floor family room. Penn National cites to the report and supplemental report of its expert. In his original report, Penn National's expert contends that there was a gap between two pieces of pipe forming the flue which allowed hot gases to come into contact with combustible materials causing the fire. *See Doc. 44 - Kufta Report.* In his supplemental report, Penn National's expert indicates that after his initial investigation it was found that the termination vent cap was never installed, that plywood probably covered the top of the chimney chase, and that the direct vent pipe never vented to the exterior. *See Doc. 59 - Kufta Supplemental Report.* In his supplemental report, Penn National's expert also indicates that he found that the screen

16

for the fireplace was not attached and was still inside the
fireplace box with the plastic covering still present and that
the glowing embers for the fireplace were in a plastic bag on
top of the firebox inside the unit. *Id.*  Penn National's expert
states that these additional findings confirm his initial
opinion that the negligent installation of the fireplace and
chimney vent and poor workmanship on the part of the installer
was the cause of the fire. *Id.*

Penn National argues that Hearth and Home failed to
answer its requests for admissions and that Hearth and Home,
therefore, has admitted the statements in the requests for
admissions and all of the elements needed for it to establish
its negligence and breach of contract claims.  Hearth and Home,
however, has filed its responses to Penn National's requests
for admissions.  Hearth and Home objected to the requests on
the basis that the requests were not timely.  Pursuant to the
Amended Case Management Order (doc. 42), all discovery was to
be planned and commenced so as to be completed by November 1,
2006.  Hearth and Home objected to Penn National's requests for
admissions on the basis that the requests were not propounded
and served until October 27, 2006, just days before the
discovery deadline, and that, therefore, the requests were
issued and served in violation of the Amended Case Management

Order.  Since Hearth and Home has objected to Penn National's requests for admissions, those requests are not deemed admitted.  Accordingly, Penn National is not entitled to summary judgment on the basis that Hearth and Home failed to answer its requests for admissions.

Penn National also argues that Hearth and Home has not offered an expert report to counter Penn National's assertion that improper installation of the fireplace was the cause of the fire and that, therefore, it should be granted summary judgment as to its claims against Hearth and Home.

As discussed elsewhere in this Report and Recommendation, there is a genuine factual dispute about whether Haldeman was an independent contractor or employee of Hearth and Home.  If Haldeman was an independent contractor and if his work was the cause of the fire, then Hearth and Home would not be liable to Penn National on Penn National's negligence claim.

Although Hearth and Home would not be liable to Penn National as to Penn National's negligence claim if Haldeman was an independent contractor and if Haldeman's work was the cause of the fire, whether or not Haldeman was an independent

contractor or employee of Hearth and Home is not material as to Penn National's breach of contract claim.  Stoltzfus' contract was with Hearth and Home, not Haldeman.  Accordingly, Hearth and Home's liability to Penn National, as subrogee of Stoltzus, for breach of contract is not dependent on whether or not Haldeman was an independent contractor.

Under Pennsylvania law, the three elements of a cause of action for breach of contract are: 1) the existence of a contract; 2) a breach of duty imposed by the contract; and 3) resulting damages.  *See Williams v. Nationwide Mutual Ins. Co.,* 750 A.2d 881, 884 (Pa.Super.Ct. 2000).

Hearth and Home contends that Penn National has failed to prove the essential terms of any contract between Hearth and Home and Stoltzfus.  Hearth and Home states that there was no written contract between it and Stoltzfus and that Stoltzfus submitted only a purchase order to Hearth and Home for the fireplace.

Penn National has submitted a copy of the purchase order for the fireplace at issue. *Doc. 1, Exhibit A.*

Although Hearth and Home argues that there was no written contract, Hearth and Home has not argued that the purchase order combined with its performance pursuant to the purchase order in providing the fireplace did not amount to a contract. Moreover, in its answer, Hearth and Home admits that Stoltzfus contracted with Hearth and Home for delivery and installation of two Heat-n-Glo gas fireplace systems, including ventilation/chimney systems. *See Doc. 9 at ¶12.* Accordingly, summary judgment on Penn National's breach of contract claim should not be denied on the basis that there was no contract or that Penn National has failed to prove the essential terms of the contract.

Hearth and Home argues that Penn National has failed to establish a breach of any duty owed by Hearth and Home to Stoltzfus. Hearth and Home appears to be relying on its assertion that the expert reports submitted by the parties indicate that there is a factual dispute about the cause of the fire. As discussed above in connection with Traveler's motion for summary judgment, Hearth and Home argues that Haldeman's expert report creates a material question of fact as to the cause of the fire. Hearth and Home argues that if, as Haldeman's expert opines, the fire was caused by the failure to vent the pipe through the top of the pipe chase, it was

Stoltzfus, as the general contractor responsible for
supervising the construction and insuring the completion of all
work, that is responsible.  Haldeman's expert, however, does
not conclude that Stoltzfus was responsible for completing the
roof flashing and vent cap.  On the contrary, Haldeman's expert
contends that Hearth and Home was responsible for failing to
complete the flashing and cap.  Hearth and Home cites to the
deposition testimony of David Albright, at the time a field
superintendent for Stoltzfus, for the proposition that
Stoltzfus as the general contractor was responsible for
supervising the construction and insuring the completion of all
work.  However, the pages of Albright's deposition cited by
Hearth and Home do not support the proposition that Stoltzfus
was responsible for ensuring completion of the fireplace
system.  Hearth and Home has not provided any other evidence to
support its assertion that Stoltzfus may have been responsible
for the fire.

        Even though the expert reports may create a question of
fact about exactly how the fire started, those reports all
agree that the fire was caused by either the negligent
installation or the premature start up of the fireplace.
Pursuant to the contract between Stoltzfus and Hearth and Home,
Hearth and Home was responsible for the installation and for

the start up of the fireplace.  Accordingly, summary judgment
in favor of Penn National on its breach of contract claim is
not precluded on the basis that there is a question of fact
about the exact cause of the fire.

Hearth and Home also contends that Penn National has
failed to establish that any asserted damages actually resulted
from a breach of the contract.

The expert reports indicate that the fire was caused by
the negligent installation or start up of the fireplace.  It is
undisputed that the fire severely damaged the model home.
Thus, to the extent that Hearth and Home is arguing that any
breach of the contract on its part did not result in any
damages, that argument is without merit.  It appears, however,
that Hearth and Home's argument is really about the measure of
damages.  Hearth and Home does not dispute that Penn National
paid Stoltzfus $559,373.70, but Hearth and Home disputes that
Penn National has proven the amount of damages allegedly
sustained by Stoltzfus or the reasonableness of any repair or
replacement costs. *See doc. 95 at ¶8.*  As we have not been
presented with any evidence regarding the measure of damages
sustained by Stoltzfus, we conclude that summary judgment

should not be granted to Penn National on its breach of contract claim against Hearth and Home.[3]

    Based on the foregoing, it will be recommended that Penn National's motion for partial summary judgment against Hearth and Home be denied.

V. Haldeman's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment against Hearth and Home and Hearth and Home's Motion for Summary Judgment against Haldeman.

    Because the issues raised in Haldeman's motion for summary judgment or, in the alternative, partial summary judgment against Hearth and Home and the issues raised in Hearth and Home's motion for summary judgment against Haldeman are essentially the same, we address those motions together.

    Hearth and Home's third-party claims (in the Penn National case) against Haldeman are claims for contribution, indemnification and breach of contract, and its cross-claims (in the Traveler's case) against Haldeman are for contribution and indemnification.  Haldeman's cross-claims (in the

---

    [3] Another approach that could be taken would be to grant partial summary judgment as to the merits of the breach of contract claim without granting summary judgment as to damages.

Traveler's case) against Hearth and Home are for contribution and indemnification.

A.   Undisputed Facts.

The following facts are not in dispute for purposes of the motions of Haldeman and Hearth and Home.

Hearth and Home is in the business *inter alia* of fireplace installation. *Statement of Material Facts for Defendant Howard Haldeman's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment at ¶12 and Defendant Hearth and Home Technologies Inc.'s Response to Defendant Howard Haldeman's Statement of Material Facts at ¶12.*

In 1999, Howard Haldeman began working for Flameworx, a company that was owned by Fred Engle and Floyd "Dusty" Wertz. *Id. at ¶¶13 & 14.*  Haldeman's job was to install fireplaces. *Id. at ¶14.*

Flameworx was subsequently purchased by the Thulman Eastern Corporation (Thulman Eastern). *Id. at ¶15.*  Thulman Eastern was later re-named American Fireplace Company (American Fireplace). *Id. at ¶16.*  Haldeman worked for Flameworx, Thulman

24

Eastern and American Fireplace installing fireplaces. *Id. at ¶17.*

By Purchase Agreement by and among American Fireplace Company and Hearth and Home, Inc., as sellers, and Hearth Technologies Inc., as buyer, dated January 28, 2000, Hearth Technologies Inc. purchased substantially all of the respective assets, properties, rights and interests of American Fireplace Company and Hearth & Home, Inc., including the right to use the name "American Fireplace Company." *Defendant, Cross-Claimant and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts as to Which There is No Genuine Issue to be Tried Filed in Support of its Motion for Summary Judgment against Howard Haldeman d/b/a Haldeman Chimney Sweep at ¶1 and Defendant Howard Haldeman's Statement of Material Facts Contra Defendant, Cross-Claimant and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts Filed in Support of its Motion for Summary Judgment against Howard Haldeman d/b/a Haldeman Chimney Sweep.* The names American Fireplace Company, Thulman Eastern Corporation, and all trade names of American Fireplace Company and/or Thulman Eastern Corporation were acquired by Hearth Technologies Inc. in January or February of 2000. *Id. at ¶2.*

25

In October of 2002, Hearth Technologies Inc. changed its name to Hearth & Home Technologies Inc. *Id. at ¶3.*

On or about March 10, 2000, Howard Haldeman signed an "Independent Contractor Agreement." *Statement of Material Facts for Defendant Howard Haldeman's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment at ¶19 and Defendant Hearth and Home Technologies Inc.'s Response to Defendant Howard Haldeman's Statement of Material Facts at ¶19.* The Agreement is between American Fireplace (referred to in the Agreement as the "Company") and Haldeman's Chimney Sweep (referred to in the Agreement as the "Contractor"). *Doc. 84, Exhibit F.* The Agreement was executed for the Company by Fred Engle. *Statement of Material Facts for Defendant Howard Haldeman's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment at ¶34 and Defendant Hearth and Home Technologies Inc.'s Response to Defendant Howard Haldeman's Statement of Material Facts at ¶34.* At the time of the execution of the Agreement, the name American Fireplace Company was a name that Hearth Technologies, Inc. owned and was permitted to use. *Defendant, Cross-Claimant and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts as to Which There is No Genuine Issue to be Tried Filed in Support of its Motion for Summary Judgment*

26

*against Howard Haldeman d/b/a Haldeman Chimney Sweep at ¶6 and*
*Defendant Howard Haldeman's Statement of Material Facts Contra*
*Defendant, Cross-Claimant and Third-Party Plaintiff Hearth &*
*Home Technologies Inc.'s Statement of Material Facts Filed in*
*Support of its Motion for Summary Judgment against Howard*
*Haldeman d/b/a Haldeman Chimney Sweep.*

Paragraph 1 of the Agreement provides that the Company engages the Contractor as an independent contractor to perform the work set forth in the Agreement and that the Contractor accepts such engagement. *Doc. 84, Exhibit F.*

Paragraph 2 of the Agreement provides that the Contractor agrees to perform work, including, but not limited to, installation and other work related to fireplaces, facings and fireplace surrounds. *Id.*

Paragraph 3 of the Agreement provides that the term of the Agreement is one year, that the Agreement will automatically renew for additional one year terms, and that either party may terminate the Agreement at any time by giving 30 days written notice. *Id.*

Paragraph 4 of the Agreement provides that the Agreement may be terminated without cause by either party by giving 30 days written notice, that termination of the Agreement will not prejudice claims arising prior to termination or relieve the parties of liability arising prior to termination, and that termination shall not relieve the Contractor of its duty to correct defective work preformed or to indemnify, defend and hold harmless the Company in instances required by the Agreement. *Id.*

Paragraph 5 of the Agreement provides that the Company agrees to compensate Contractor according to an attached rate schedule, that the rates are subject to change by the Company, and that the Company will notify the Contractor in advance of any changes to the rate schedule. *Id.*

Paragraph 6 of the Agreement concerns terms of payment and provides that the Company will pay the Contractor on a weekly basis subject to a retention set forth in paragraph 7. *Id.* Paragraph 6 also provides that the Contractor's work is not acceptable if the Company's customer refuses to accept it, if the work is not done according to the applicable fireplace manufacturer's instructions, building codes and laws, or is not done in a first-class workmanlike manner. *Id.*  Paragraph 6 also

includes provisions regarding the procedure for correcting work. *Id.*

Paragraph 7 of the Agreement deals with the amount of and procedures regarding a retention by the Company of a sum as partial assurance of the Contractor's performance. *Id.*

Paragraph 8 of the Agreement deals with back charges. *Id.*

Paragraph 9 of the Agreement provides that the Contractor is solely responsible for obtaining and maintaining all licenses and permits necessary to operate its business. *Id.* Paragraph 9 also provides that the Contractor warrants and guarantees his work and the materials he furnishes for a period of one year and contains provisions regarding how claims of defects will be handled. *Id.* Paragraph 9 also provides that the Contractor will not divert elsewhere any sales or business that could be transacted by the Company. *Id.*

Paragraph 10 of the Agreement provides the Company with authorization to investigate the Contractor. *Id.*

Paragraph 11 of the Agreement provides that, except as otherwise provided, the Contractor shall provide all labor, services, equipment and tools required for the work of the Contractor under the Agreement and that the Contractor may employee such employees as he deems necessary to perform his work under the Agreement. *Id.*

Paragraph 12 of the Agreement provides that the Company shall furnish to the Contractor all fireplaces and component parts necessary to perform the work under the Agreement. *Id.*

Paragraph 13 of the Agreement provides that the Company will not contribute to Medicare, Social Security, unemployment insurance or any other employment taxes or withhold federal or state income taxes from the compensation paid the Contractor and that the Contractor will be responsible for the payment of all applicable employment and income taxes. *Id.*

Paragraph 14 of the Agreement provides that the Contractor understands and agrees that he is acting as an independent contractor and that as an independent contractor he is not entitled to any employment benefits including health insurance, retirement benefits, workers compensation insurance or unemployment insurance. *Id.*  Paragraph 14 also provides that

30

the Company has no right to discourage or inhibit the
Contractor's right to enter into other contracts as the
Contractor sees fit. *Id.*


        Paragraph 15 of the Agreement is an indemnification
provision and provides:

        Contractor shall indemnify, defend and hold
        Company harmless from any and all claims,
        liability, loss, or damage, including
        reasonable attorney's fees, arising by reason
        of the death or bodily injury of persons,
        injury to property or other loss or damage
        arising out of, concerning or affecting this
        Agreement or the business conducted by
        Contractor, including but not limited to, any
        acts or failure to act on the part of the
        Contractor, his agents, servants or employees.
*Id.*


        Paragraph 16 of the Agreement provides that the
Contractor is solely responsible for compliance with all OSHA,
state and local safety regulations relating to the work to be
performed under the Agreement. *Id.*


        Paragraph 17 of the Agreement deals with insurance and
provides:

        Insurance - Contractor agrees that he will
        obtain insurance coverage in compliance with
        all the Company's Insurance Requirements as
        set forth in the attached Exhibit A, including
        coverage for Contractor's employees.  If
        Contractor fails to comply with the insurance
        requirements then Contractor will not be

31

permitted to perform any further work for
Company until insurance coverage is obtained.
If it is subsequently determined that work was
performed without the required insurance
coverage, then Company will back charge
Contractor as set forth in paragraph eight (8)
herein for the respective premiums due as set
forth below for all work performed without the
required insurance coverage.  For work
performed without the insurance coverage the
following percentage of payments due
Contractor will be back charged as
reimbursement to Company for their additional
insurance liability:

       WORKER'S COMPENSATION PREMIUM   ____%

       GENERAL LIABILITY PREMIUM       ____%

*Id.*


Paragraph 18 of the Agreement sets forth events that
will be deemed to be a default under the Agreement and the
effect of any default by the Contractor. *Id.*


Paragraph 19 of the Agreement provides that any
assignment by Contractor of the Agreement or any interest or
money due under the agreement without the express prior consent
of the Company is not valid. *Id.*  Paragraph 19 also provides
that the Company shall have the right to transfer or assign the
Agreement to a present or future parent, subsidiary, or
affiliate. *Id.*

Paragraph 20 of the Agreement deals with Attorney's fees. *Id.*

Paragraph 21 of the Agreement contains an integration clause and provides that any change to the Agreement must be in writing and signed by the parties. *Id.*

Paragraph 22 of the Agreement deals with how the words and headings in the Agreement are to be construed. *Id.*

Paragraph 23 of the Agreement provides that it shall be governed by the laws of the State of Maryland, that Maryland shall be the place of venue for all disputes and that the parties waive their right to a jury trial. *Id.*

On or about February 24, 2004, Haldeman supplied Hearth and Home with a Certificate of Insurance evidencing insurance coverage having been obtained from Penn National with effective dates of February 15, 2004 through February 15, 2005. *Statement of Material Facts for Defendant Howard Haldeman's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment at ¶120 and Defendant Hearth and Home Technologies Inc.'s Response to Defendant Howard Haldeman's Statement of Material Facts at ¶120.* The Certificate of Insurance had a

letter "N" preceding the words "Additional Insured." *Id. at ¶122.*

The Penn National insurance policy obtained by Haldeman did not specifically name Thulman Eastern as an additional insured. *Id. at ¶115.* The policy did, however, contain a blanket "Automatic Additional Insured - Owners, Contractors and Subcontractors" endorsement. *Id.*

Hearth and Home never told Haldeman that he was not permitted to work because the insurance he obtained was not in compliance with the Thulman Eastern Corporation Insurance Requirements. *Id. at ¶119.*

Haldeman's initial training on how to install fireplaces was "on the job training" from Dusty Wertz and Fred Engle while Haldeman worked at Flameworx. *Id. at ¶54.* Haldeman also received instruction and training from Hearth and Home on how to properly install fireplaces. *Id. at ¶55.* This instruction was supplemented by training updates by Hearth and Home which occurred approximately every two weeks and were called "dock talks" *Id. at ¶*55. "Dock talks" is a process of communicating safety, quality, new product changes and other

hot topics to Hearth and Home's employees and subcontractors. *Id. at* ¶56.

Haldeman would report to the York Division of Hearth and Home each work day morning. *Id. at* ¶57.  Haldeman typically worked five days a week, approximately 8 to 10 hours a day. *Id. at* ¶58.

The York Division of Hearth and Home consists of office space and an attached warehouse. *Id. at* ¶59.  A schedule board in the warehouse listed job assignments of the fireplace installers, both employee installers and "independent contractor" installers. *Id. at* ¶60.  Bins for job assignment paperwork were maintained for each employee and "independent contractor" installer. *Id. at* ¶61.  The bins contained the work orders/paper work for each installer and the paperwork, with the exception of paperwork for payment for a job, was the same for employee installers and "independent contractor" installers. *Id. at* ¶62.

"Independent contractor" installers were paid by the job, not the hour. *Id. at* ¶96.

35

There were no specific differences as to how assignments were given to employee installers and "independent contractor" installers. *Id. at ¶63.* The "independent contractor" installers did not bid for or pick the job assignments that they wanted. *Id. at ¶*64. Rather, the jobs were assigned by Cathy Deiter of Hearth and Home to each installer. *Id. at ¶¶64 &65.* Absent special circumstances, such as a builder requesting a special install time, both employer installers and "independent contractor" installers were permitted to decide how to approach the day's work in terms of which job to start first and which job to end with. *Id. at ¶*65.

An employee of Hearth and Home would select the appropriate fireplace for each installer and set the fireplace in the warehouse identifying it for a particular job. *Id. at ¶*69. The installers would then pick the parts that they needed for each installation job from the inventory of Hearth and Home's warehouse. *Id. at ¶*70. Materials needed for a fireplace installation were provided to employee installers and "independent contractor" installers in the same way. *Id. at ¶*71. The "independent contractor" installers did not have to purchase and did not supply their own parts or materials for the installation jobs. *Id. at ¶*72. Consumable goods used on a job, such a caulking, screws, insulation, and nails, were

supplied by Hearth and Home for use by employee and "independent contractor" installers at the job sites. *Id. at* ¶73.

Typically, screw drivers, a saw, a hammer, wrenches, and cordless drills are needed to install a fireplace. *Id. at* ¶77.  While Hearth and Home required "independent contractor" installers to obtain their own tools, Hearth and Home permitted "independent contractor" installers to borrow tools. *Id. at* ¶78.  Hearth and Home permitted "independent contractor" installers to borrow 40 foot extension ladders, hammer drills and generators as needed to complete installation jobs. *Id. at* ¶79.

Hearth and Home provided both employee installers and "independent contractor" installers with cellular phones. *Id. at* ¶81.

After an installation job was complete both employee installers and "independent contractor" installers would turn their paperwork into Cathy Deiter. *Id. at* ¶83.

Both types of installers could contact a representative from Hearth and Home to help "trouble shoot" an installation

37

job. *Id. at* ¶86.  If a problem arose during an installation
project, both employee installers and "independent contractor"
installers could call Ken Sharp, the field operations
supervisor of Hearth and Home, for advice. *Id. at* ¶85.  Sharpe
provided advice to installers if they had a question and could
call "corporate" if he did not know the answer. *Id. at* ¶89.

If an installer, regardless of type, did something
wrong it would be the same people, i.e. Ken Sharp and Fred
Engle, who would notify the installer of the mistake. *Id. at*
¶93.

The installers reported to Ken Sharp for direction and
he provided quality supervision for the installers. *Id. at* ¶90.
Ken Sharp inspected the work of both employee installers and
"independent contractor" installers. *Id. at* ¶87.  He conducted
"spot checks" to insure installation work was being completed
properly. *Id. at* ¶88.

Cort Miller is a former employee installer for Hearth
and Home. *Id. at* ¶66.  Miller worked on installation jobs with
Haldeman "quite a few times" and they would double-check each
others work. *Id. at* ¶68.

On May 24, 2004, the day of the installation of the fireplace in question, Haldeman, Cort Miller, Ken Sharp, and Floyd "Dusty" Wertz were all at the Stoltzfus model home. *Id. at ¶104.*

Haldeman installed the fireplace in the bedroom. *Id. at ¶106.* Cort Miller did preparation work for the Escape Model fireplace, the fireplace in the family room, and he and Sharp physically placed the fireplace unit in position. *Id. at ¶107.*

With respect to the Escape Model fireplace, Haldeman worked in conjunction with Cort Miller and Ken Sharp to install the flue. *Defendant, Cross-Claimant and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts as to Which There is No Genuine Issue to be Tried Filed in Support of its Motion for Summary Judgment against Howard Haldeman d/b/a Haldeman Chimney Sweep at ¶62 and Defendant Howard Haldeman's Statement of Material Facts Contra Defendant, Cross-Claimant and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts Filed in Support of its Motion for Summary Judgment against Howard Haldeman d/b/a Haldeman Chimney Sweep.* Haldeman recalls being in the attic chase with Cort Miller and he does not deny installing vent piping above the ceiling of the first floor.

*Id. at ¶¶63 & 64.*  The area in the attic space above the rafters was so narrow that Haldeman wedged himself in there so as to be able to connect the pipe and run it up. *Id. at ¶65.* After putting on the attic sleeve, Haldeman did not check to insure that the pipes were put together properly. *Id. at ¶66.*

Haldeman acknowledged that he was supposed to install the fireplace, including the vent piping, and he admits that he installed some pipe at the Stoltzfus property.  *Id. at ¶60.*

By a letter dated July 14, 2005, counsel for Hearth and Home made a demand upon Haldeman for indemnification and defense under the terms and provisions of the Independent Contractor Agreement. *Id. at ¶69.*  Haldeman refused to tender a defense or indemnification to Hearth and Home. *Id. at ¶70.*

B. Validity and Enforceability of the Independent Contractor Agreement.

1. Enforceability of the Agreement.

Haldeman contends that the Independent Contractor Agreement is unenforceable by Hearth and Home because the agreement was entered into by American Fireplace Company. Haldeman argues that Hearth and Home was not a successor

40

corporation to American Fireplace Company and did not merge
with American Fireplace Company.  Haldeman argues that American
Fireplace Company is a distinct corporation with no connection
to Hearth and Home.

Despite his argument that the Agreement is
unenforceable by Hearth and Home, Haldeman has not disputed
Hearth and Home's assertions that by a Purchase Agreement by
and among American Fireplace Company and Hearth and Home, Inc.,
as sellers, and Hearth Technologies Inc., as buyer, dated
January 28, 2000, Hearth Technologies Inc. purchased
substantially all of the respective assets, properties, rights
and interests of American Fireplace Company and Hearth & Home,
Inc., including the right to use the name "American Fireplace
Company," that the name American Fireplace Company was acquired
by Hearth Technologies Inc. in January or February of 2000, and
that in October 2002, Hearth Technologies Inc. changed its name
to Hearth & Home Technologies Inc. *See Doc. 71 at ¶¶1-3 and
Doc. 88.*

Since it is not disputed that Hearth Technologies Inc.
- which later changed its name to Hearth & Home Technologies
Inc. (the Hearth and Home in this case) - purchased the right
to use the name "American Fireplace Company" in January or

February of 2000, before the Independent Contractor Agreement
in this case was executed, we conclude that Haldeman's
contention that the Independent Contractor Agreement is
unenforceable by Hearth and Home because the agreement was
entered into by American Fireplace Company is without merit.

2. Independent Contractor or Employee.

Haldeman contends that the Independent Contractor
Agreement is void or voidable because he was an employee of
Hearth and Home rather than an independent contractor.
Hearth and Home contends that Haldeman was an independent
contractor and not an employee.

"Under Pennsylvania law, when an injury is done by an
"independent contractor," the person employing him is generally
not responsible to the person injured." *Drexel v. Union
Prescription Centers, Inc.,* 582 F.2d 781, 785 (3d Cir. 1978).
"However, when the relationship between the parties is that of
"master-servant" or "employer-employee," as distinguished from
"independent contractor-contractee," the master or employer is
vicariously liable for the servant's or employee's negligent
acts committed within the scope of his employment." *Id.*

42

The difference between a servant or employee and an independent contractor revolves around the employer's degree of control over how the work in question is done.  The Pennsylvania Supreme Court has stated:

> The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.

*Green v. Independent Oil Co.,* 201 A.2d 207, 210 (Pa. 1964). "In ascertaining whether a person is an employee or an independent contractor, the basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged." *Id.* at 210 (footnote omitted).  Although the right to control the manner in which the work is to be done is the touchstone of the inquiry, a number of other factors may be relevant to determining whether a person was an employee or an independent contractor including: whether the person has responsibility for results only, the terms of any agreement between the parties, the nature of the work to be done, the skill required for performance, whether one employed is engaged in a distinct occupation or business, which party supplies the tools, whether

43

payment is by time or by the job, whether the work is part of the regular business of the employer, and the right to terminate employment at any time. *Hammermill Paper Co. v. Rust Engineering Co.,* 243 A.2d 389, 392 (Pa. 1968).  "Whether some or all of these factors exist in any given situation is not controlling." *Universal Am-Can, Ltd. v. Workers Compensation Appeal Bd.,* 762 A.2d 328, 333 (Pa. 2000).  "Further, while each factor is relevant, there are certain guidelines that have been elevated to be dominant considerations." *Id.*  "[C]ontrol over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status." *Id.*  "Moreover, it is the existence of the *right* to control that is significant, irrespective of whether the control is actually exercised." Id.

"The precise nature of the relationship, under the evidence, presents a question of fact which it is the exclusive function of the jury to determine, after proper instructions by the court as to the matters of fact to be considered, except where the facts are not in dispute and the evidence is direct and certain, presenting no question of credibility and leaving no sufficient ground for inconsistent inferences of fact." *Joseph v. United Workers Ass'n,* 23 A.2d 470, 472-73 (Pa. 1942).

Hearth and Home points to the Independent Contractor Agreement to support its contention that Haldeman was an independent contractor rather than an employee.

The Independent Contractor Agreement identifies Haldeman as an independent contractor and indicates that Haldeman is being engaged as an independent contractor. However, the Agreement is not determinative of the question whether Haldeman was an independent contractor or employee "for it is the actual practice between the parties which is crucial." *George v. Nemeth,* 233 A.2d 231, 233 (Pa. 1967).

Hearth and Home contends that Haldeman and the claims adjuster for Penn National have admitted that Haldeman was an independent contractor.  However, the determinative factor is not the way in which the parties regard the relationship but "'what it really was under the facts and applicable rules of law.'" *Jones v. Century Oil U.S.A., Inc.,* 957 F.2d 84, 86 (3d Cir. 1992)(quoting *Feller v. New Amsterdam Casualty, Co.,* 70 A.2d 299, 302 (Pa. 1950)).

In addition to the terms of the Independent Contractor Agreement, Hearth and Home points to the following factors which it contends support its contention that Haldeman was an

45

independent contractor rather than an employee: Haldeman
entered into the Independent Contractor Agreement in the name
of Haldeman's Chimney Sweep and his insurance coverage with
Penn National was in the name of Haldeman's Chimney Sweep;
Haldeman received IRS 1099 forms from Hearth and Home which
reflected that he was paid non-employee compensation; Haldeman
acknowledged that nothing was deducted from the checks he
received from Hearth and Home and that the payments made to him
reflected on their face that they were for "contract labor";
Haldeman could schedule his own vacation whenever he wanted to
take it without seeking approval from Hearth and Home; Haldeman
did not receive any kind of benefits, sick leave or health
insurance from Hearth and Home; Hearth and Home is involved in
manufacturing, distributing and selling fireplaces in addition
to installing them; Haldeman testified that in the past he
performed and could perform chimney sweep services separate
from his work for Hearth and Home; and Hearth and Home's
"independent contractor" installers were require to provide
their own tools and were only permitted to borrow large or
expensive equipment.

Haldeman points to the following factors which he
contends support his contention that he was an employee of
Hearth and Home rather than an independent contractor: the

46

skill required to install fireplaces is not unlike that of
other manual labor jobs and the skills of the "independent
contractor" installers with Heath and Home was the same as
those of the employee installers at Hearth and Home; he has no
formal education beyond the high school level; he attended
training provided by Hearth and Home every two weeks; Hearth
and Home allowed "independent contractor" installers to borrow
tools; Hearth and Home provided its "independent contractor"
installers with cellular telephones; Hearth and Home provided
him with consumable materials such as caulk, nails, insulation
and screws to use on the job and "independent contractor"
installers would pull the parts that they needed for a job from
Hearth and Home's warehouse; he reported to the York Division
of Hearth and Home every work day and he worked 30-40 hours a
week on jobs for Hearth and Home; Hearth and Home has referred
to him as an "exclusive subcontractor" and pursuant to the
Independent Contractor Agreement he is prohibited from
diverting elsewhere any sales or business that could be
transacted by Hearth and Home; Hearth and Home paid him
individually rather than paying Haldeman Chimney Sweep;
fireplace installation work is the very work and business that
Hearth and Home is regularly engaged to perform; Hearth and
Home uses employee installers in conjunction with "independent
contractor" installers on the same projects and when they work

together the installers check each other's work; there was no specific differences in the assignments given to employee installers and "independent contractor" installers.

Haldeman also contends that Hearth and Home provided supervision of "independent contractors."

Haldeman contends, and Hearth and Home has not disputed, that both types of installers could contact a representative from Hearth and Home to help "trouble shoot" an installation job, and that, if a problem arose during an installation project, both employee installers and "independent contractor" installers could call Ken Sharp, the field operations supervisor of Hearth and Home, for advice. Sharpe provided advice to installers if they had a question and could call "corporate" if he did not know the answer. If an installer, regardless of type, did something wrong it would be the same people, i.e. Ken Sharp and Fred Engle, who would notify the installer of the mistake. The installers reported to Ken Sharp for direction and he provided quality supervision for the installers. Ken Sharp inspected the work of both employee installers and "independent contractor" installers. He conducted "spot checks" to insure installation work was being completed properly.

48

Although it is not disputed that a representative of Hearth and Home was available to help an independent contractor to "trouble shoot" a job and that Ken Sharp would spot check an installer's installation work, it is not clear from the record in this case whether Hearth and Home exercised day to day supervision or control over the work of its "independent contractor" installers.

The terms of the Independent Contractor Agreement, the manner in which Haldeman was paid and the fact that he was not provided any benefits provide strong support for a finding that Haldeman was an independent contractor rather than an employee. Nevertheless, there is a genuine factual dispute about how much control Hearth and Home exercised over Haldeman's work.  That factual dispute is material to the question whether Haldeman was an independent contractor or an employee of Hearth and Home.  Accordingly, summary judgment can not be entered on the issue of whether Haldeman was an employee of Hearth and Home or was an independent contractor.

3. Contract of Adhesion Argument.


Haldeman contends that the Independent Contractor
Agreement is unenforceable because it is a contract of
adhesion.


A contact of adhesion is a contract "'that is drafted
unilaterally by the dominant party and then presented on a
'take-it-or-leave-it' basis to the weaker party who has no real
opportunity to bargain about its terms.'" *Walther v. Sovereign
Bank,* 872 A.2d 735, 746 (Md. 2005)(quoting *Restatement (Second)
of Conflict of Laws* § 187 cmt. B (1971)).  "The fact that a
contract is one of adhesion does not mean that either it or any
of its terms are invalid or unenforceable."  *Meyer v. State
Farm Fire & Cas. Co.,* 582 A.2d 275, 278 (Md.Ct.Spec.App. 1990).
A court will look at a contract of adhesion and its terms with
special care, will construe ambiguities against the draftsman
and will refuse to enforce terms that are unconscionable. *Id.*
However, a court "will not simply excise or ignore terms merely
because, in the given case, they may operate to the perceived
detriment of the weaker party." *Id.*  "A contract of adhesion is

not automatically deemed *per se* unconscionable." *Walther, supra,* 872 A.2d at 746.[4]

Haldeman contends that the terms of the Independent Contractor Agreement are one-sided and oppressive because he is an employee rather than an independent contractor.  He contends that the Agreement contains terms that are contrary to law for those with employee status.  As indicated above, there is a material question of fact about whether Haldeman was an independent contractor or an employee.  Given that question of fact, we can not conclude that the Independent Contractor Agreement is unenforceable on the basis that it is contract of adhesion containing unconscionable terms when applied to an employee.

C. Scope of Indemnity Provision.

Hearth and Home contends that under the Independent Contractor Agreement Haldeman is require to indemnify and defend it.  Haldeman contends that the indemnity provision of the Independent Contractor Agreement does not entitle Hearth and Home to indemnity for its own negligence.

_____

[4] We cite Maryland law because the Independent Contractor Agreement provides that it shall be governed by Maryland law.

Under Maryland law[5], "contracts will not be construed to indemnify a person against his own negligence unless an intention so to do is expressed in those very words or in other unequivocal terms." *Crockett v. Crothers,* 285 A.2d 612, 615 (Md. 1972). "[O]ne of the reasons why contracts to indemnify must be expressed in unequivocal terms is to protect the unwary or uninformed promisor." *Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 578 A.2d 1202, 1208 (Md. 1990).

The indemnity provision of the Independent Contractor Agreement provides:

> Contractor shall indemnify, defend and hold Company harmless from any and all claims, liability, loss, or damage, including reasonable attorney's fees, arising by reason of the death or bodily injury of persons, injury to property or other loss or damage arising out of, concerning or affecting this Agreement or the business conducted by Contractor, including but not limited to, any acts or failure to act on the part of the Contractor, his agents, servants or employees.

Hearth and Home argues that the indemnity provision obligates Haldeman to indemnify and defend Hearth and Home for any damage that was the direct or indirect result of the contracted work. Although the indemnity provision is broad in

---

[5] Again, we apply Maryland law because the Independent Contractor Agreement provides that it shall be governed by the laws of Maryland.

52

that it applies to all claims "arising out of, concerning or affecting" the Agreement or the business of the Contractor, it does not expressly or unequivocally provide that the Contractor shall indemnify the Company for the Company's own negligence.

Citing the last clause of the indemnity provision, which reads "including but not limited to, any acts or failure to act on the part of the Contractor, his agents, servants or employees," Hearth and Home argues that the indemnity provision provides indemnity for negligence committed by others, including agents or employees of Hearth and Home.  The last clause of the indemnity provision, however, does not expressly or unequivocally indicate an intent that the Contractor shall indemnify the Company for the Company's own negligence.

Hearth and Home notes that there is a Maryland statute dealing with indemnity agreements in construction contracts. That statute, MD.CODE ANN., CTS. & JUD. PROC. § 5-401 (formerly 5-305), provides:

> A covenant, promise, agreement or
> understanding in, or in connection with or
> collateral to, a contract or agreement
> relating to the construction, alteration,
> repair, or maintenance of a building,
> structure, appurtenance or appliance,
> including moving, demolition and excavating
> connected with it, purporting to indemnify the
> promisee against liability for damages arising
> out of bodily injury to any person or damage

>           to property caused by or resulting from the
>           sole negligence of the promisee or indemnitee,
>           his agents or employees, is against public
>           policy and is void and unenforceable.  This
>           section does not affect the validity of any
>           insurance contract, workers' compensation, or
>           any other agreement issued by an insurer.

Hearth and Home asserts that if a particular contract provision can be properly construed as reflecting two agreements, one providing for indemnity if the promisee is solely negligent and one providing for indemnity if the promisee and promisor are concurrently negligent, only the former agreement is void under § 5-401.  Hearth and Home argues that, to the extent that the indemnity provision reflects the parties' intent concerning concurrent negligent, § 5-401 is inapplicable.

We disagree with Hearth and Home's suggestion that the indemnity provision in this case can properly be construed as providing for indemnity of the Company if the Company and Contractor are concurrently negligent.  As discussed above, contracts will not be construed to indemnify a person against his own negligence unless an intention so to do is expressed in those very words or in other unequivocal terms. *Crockett, supra,* 285 A.2d at 615.  The indemnity provision in the Independent Contractor Agreement does not expressly or unequivocally provide that the Contractor shall indemnify the Company for either the Company's sole negligence or the

Company's concurrent negligence.  Therefore, the indemnity
provision can not be construed to indemnify Hearth and Home for
Hearth and Home's own negligence.

At this point, the cause of the fire has not been
determined.  The trier of fact could conclude that Haldeman
caused the fire, that Hearth and Home caused the fire, that
both Haldeman and Hearth and Home caused the fire, or that
neither Haldeman nor Hearth and Home caused the fire.  Thus,
although we conclude that the indemnity provision in the
Independent Contractor Agreement can not be construed to
indemnify Hearth and Home for Hearth and Home's own negligence,
that conclusion does not necessarily mean that Haldeman will
not be required under the Agreement to indemnify Hearth and
Home.  Pursuant to the Independent Contractor Agreement,
Haldeman must indemnify Hearth and Home for Haldeman's own
negligence.

D. The Insurance Requirements.

Hearth and Home contends that Haldeman breached the
Independent Contractor Agreement by failing to have Hearth and
Home named as an additional insured under Haldeman's insurance
policy issued by Penn National.

55

Paragraph 17 of the Independent Contractor Agreement provides:

> Insurance - Contractor agrees that he will obtain insurance coverage in compliance with all the Company's Insurance Requirements as set forth in the attached Exhibit A, including coverage for Contractor's employees.  If Contractor fails to comply with the insurance requirements then Contractor will not be permitted to perform any further work for Company until insurance coverage is obtained.  If is it subsequently determined that work was performed without the required insurance coverage, then Company will back charge Contractor as set forth in paragraph eight (8) herein for the respective premiums due as set forth below for all work performed without the required insurance coverage.  For work performed without the insurance coverage the following percentage of payments due Contractor will be back charged as reimbursement to Company for their additional insurance liability:
>
> WORKER'S COMPENSATION PREMIUM    ____%
>
> GENERAL LIABILITY PREMIUM        ____%

Hearth and Home contends that when the Independent Contractor Agreement was signed, a page entitled "Thulman Eastern Corporation Insurance Requirements" (Insurance Requirements) was a part of the Agreement. *Doc. 71 at ¶ 7 and Doc. 101, Exhibit 8.*  The Insurance Requirements set forth the minimum insurance coverage limits that contractors and subcontractors providing services for Thulman Eastern are required to obtain, and they provide that all contractors and

56

subcontractors shall provide a Certificate of Insurance to Thulman Eastern. *Doc. 101, Exhibit 8.* The Insurance Requirements also provide that "[a]ll policies of insurance, except Workers' Compensation, obtained by the Contractor in accordance with these requirements, shall name Thulman Eastern Corporation as an Additional Insured." *Id.*

In support of its contention that the Insurance Requirements were part of the Independent Contractor Agreement, Hearth and Home cites the deposition testimony of Fredrick Engle. Engle testified that as of March 10, 2000, when the Agreement was signed, the Insurance Requirements were part of the Agreement. *Engle Dep. (Doc. 84, Exhibit D) at 117.*

Haldeman disputes that the Insurance Requirements were given to him as part of the Independent Contractor Agreement.

Haldeman states that when he signed the Independent Contractor Agreement he knew that he had to get and pay for general liability insurance. *Haldeman Affidavit (Doc. 84, Exhibit E) at ¶20.* He states that Fred Engle had told him that he needed to get liability insurance with a one million dollar limit. *Id.* He states, however, that he does not believe that he was ever given the "Thulman Eastern Corporation Insurance

Requirements," or any other insurance requirements, by anyone until after this lawsuit began. *Id. at ¶24.* He states that he does not recall Fred Engle or anyone else at Hearth and Home ever discussing any issue relating to additional insured requirements or that Hearth and Home wanted to be named as an additional insured on any of his policies. *Id. at ¶20.*

Haldeman states that if he had received the Insurance Requirements in 2000, or any time before this lawsuit began, he would have given the Insurance Requirements to his wife, who takes care of insurance matters for him and keeps his records that relate to his fireplace installation work. *Id. at ¶24.* Haldeman's wife states that after this lawsuit began, she checked all of her files and those files did not include any "Thulman Eastern Corporation Insurance Requirements" or any other insurance requirements. *Kathy Haldeman Affidavit (doc. 84, Exhibit U) at ¶4.* She states that had Haldeman given her any insurance requirements, she would have kept those requirements and filed them in her files. *Id. at ¶5.*

Haldeman states that he does not recall ever discussing with his wife any requirement relating to additional insureds on his policies before this lawsuit began and that, had he known of any such requirement, he would have discussed the

58

requirement with his wife, as she is the one that calls his insurance agents and arranges for his insurance. *Haldeman Affidavit (Doc. 84, Exhibit E) at ¶25.* Haldeman's wife states that before this lawsuit began Haldeman never discussed with her anything having to do with any requirement relating to additional insureds on his policies. *Kathy Haldeman Affidavit (doc. 84, Exhibit U) at ¶6.* She states that she does recall that Haldeman told her in 2000 that he needed to get insurance with a one million dollar limit and that she called his insurance agent to get that insurance. *Id. at ¶6.*

Based on the above, we conclude that there is a genuine factual dispute about whether the Insurance Requirements were a part of the Independent Contractor Agreement signed by Haldeman.

Haldeman argues that even assuming *arguendo* that the Insurance Requirements were part of the Independent Contractor Agreement there was no requirement that he name Hearth and Home as an additional insured because the Insurance Requirements only require that Thulman Eastern be named as an additional insured.

As set forth above, Haldeman has not disputed Hearth and Home's assertions that by a Purchase Agreement by and among American Fireplace Company and Hearth and Home, Inc., as sellers, and Hearth Technologies Inc., as buyer, dated January 28, 2000, Hearth Technologies Inc. purchased substantially all of the respective assets, properties, rights and interests of American Fireplace Company and Hearth & Home, Inc., including the right to use the name "American Fireplace Company." *See Doc. 71 at ¶1 and Doc. 88.*  Haldeman has also not disputed that the names American Fireplace Company, Thulman Eastern Corporation, and all trade names of American Fireplace Company and/or Thulman Eastern Corporation were acquired by Hearth Technologies Inc. in January or February of 2000, and that in October 2002, Hearth Technologies Inc. changed its name to Hearth & Home Technologies Inc. *See Doc. 71 at ¶¶2 &3 and Doc. 88.*

Since it is not disputed that Hearth Technologies Inc. - which later changed its name to Hearth & Home Technologies Inc. (the Hearth and Home in this case) - purchased the right to use the name Thulman Eastern Corporation in January or February of 2000, before the Independent Contractor Agreement in this case was executed, we conclude that Haldeman's contention that the Insurance Requirements of the Independent

60

Contractor Agreement are not enforceable by Hearth and Home because the Insurance Requirements reference the name Thulman Eastern, rather than Hearth and Home, is without merit.

Haldeman also argues that even assuming *arguendo* that the Insurance Requirements were part of the Independent Contractor Agreement, Hearth and Home waived its rights under the Additional Insured Clause of the Insurance Requirements.

It is undisputed that on or about February 24, 2004, Haldeman supplied Hearth and Home with a Certificate of Insurance evidencing insurance coverage having been obtained from Penn National with effective dates of February 15, 2004 through February 15, 2005. *Statement of Material Facts for Defendant Howard Haldeman's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment at ¶120 and Defendant Hearth and Home Technologies Inc.'s Response to Defendant Howard Haldeman's Statement of Material Facts at ¶120.* The Certificate of Insurance had a letter "N" preceding the words "Additional Insured." *Id. at ¶122.*

Haldeman asserts that despite the Certificate of Insurance which indicated that Hearth and Home had not been named as an additional insured Hearth and Home never informed

him that he had not complied with the Insurance Requirements
and it permitted him to work.  Haldeman argues that by failing
to inform him that he had not complied with the Insurance
Requirement and by permitting him to work Hearth and Home
waived its rights under the Additional Insured Clause of the
Insurance Requirements.

It is well established that as a general rule the
parties to a contract may waive the requirements of the
contract. *Myers v. Kayhoe,* 892 A.2d 520, 530 (Md. 2006).  "A
waiver is the intentional relinquishment of a known right, or
such conduct as warrants an inference of the relinquishment of
such right, and may result from an express agreement or be
inferred from circumstances." *Bargale Indus., Inc. v. Robert
Realty Co., Inc.,* 343 A.2d 529, 533 (Md. 1975).  "A waiver of a
contractual provision must be clearly established and will not
be inferred from equivocal acts or language." *Myers, supra,* 892
A.2d at 531.  "Whether there has been a waiver of a contractual
right involves a matter of intent that ordinarily turns on the
factual circumstances of each case." *Questar Homes of Avalon v.
Pillar Construction, Inc.,* 882 A.2d 288, 294-95 (Md. 2005).

Hearth and Home contends that, although the Certificate
of Insurance had a "N" next to the box labeled "Additional

Insured," the Certificate of Insurance had been sent to it by
facsimile transmission and it was difficult to discern whether
it was an "N" or an "X" in the box next to the word "additional
insured."  Hearth and Home also contends that the typed
notation "FIRESID" appeared directly below the typed language
"ADDITIONAL INSURED; INSURER LETTER: __" on the Certificate of
Insurance.  Hearth and Home argues that it was lead to believe
that it had been named as an additional insured under the
policy and that, therefore, it did not waive its rights under
the Additional Insured Clause of the Insurance Requirements.

     The copy of the facsimile Certificate of Insurance
submitted by Hearth and Home confirms that it is difficult to
discern whether the box next to the phrase "additional insured"
is marked with an "N" or an "X."  *See doc. 93, Exhibit B.*

     In addition to the facsimile copy of the Certificate of
Insurance, Hearth and Home cites to the testimony of Fredrick
Engle in support of its contention that the Certificate of
Insurance led it to believe that it had been named as an
additional insured under the policy.[6]   Engle in his deposition

_____

     [6] Hearth and Home also cites to a letter dated September
2, 2005 from its counsel to Penn National's insurance adjuster in
support of its contention that the Certificate of Insurance led it
to believe that it had been named as an additional insured under
the policy.  A letter from counsel written almost a year after the

testimony stated what he expected to be in the packet that he received back from an independent contractor when an Independent Contractor Agreement was signed. *Engle Dep. (Doc. 84, Exhibit D) at 119.*   Engle was then asked whether when he received the packet back he expected to see anything in there about additional insured requirements. *Id. at* 120.   He testified that the only thing he was looking for was "what you have, Exhibit 1 here, with the limits being listed and Fireside or Thulman Eastern or whoever, listed as an additional insured." *Id.*   The Exhibit 1 referred to by Engle is the Certificate of Insurance at issue in this case.   Engle was then asked where on the Certificate of Insurance he would look for language identifying Hearth and Home as an additional insured and he responded by indicating (apparently to the Certificate of Insurance) that "[i]t says additional insured and then it has Fireside listed." *Id.*

     Haldeman argues that Engle's apparent "misunderstanding" about the meaning of the Certificate of Insurance is not relevant to the waiver issue because Engle testified that it was Hearth and Home's corporate division that was responsible for dealing with certificates of insurance and

---

fire at issue is not relevant to the waiver issue.   Thus, we have not considered the letter in connection with the waiver issue.

because he relied on "corporate" to interpret certificates of insurance.

It is not clear whether it was Engle's responsibility to initially screen the certificates of insurance received from independent contractors.  However, given Engle's testimony that when he received the packets from independent contractors he was looking for the limits listed on the Certificate of Insurance and whether Fireside or Thulman Eastern or whoever was listed as an additional insured and given the unclear nature of the facsimile copy of the Certificate of Insurance presented to Hearth and Home we can not say as a matter of law that Hearth and Home waived its rights under the Additional Insured Clause of the Insurance Requirements.[7]

Haldeman also argues that Hearth and Home can not establish that it breached the Agreement by failing to name

_____

[7] Haldeman argues in his reply brief (doc. 108) in support of his motion against Hearth and Home that Hearth and Home is equitably estopped from enforcing the Additional Insured Clause of the Insurance Requirements.  In connection with his waiver argument, Haldeman alluded to estoppel principles.  However, he did not specifically raise equitable estoppel until his reply brief. When an issue is raised for the first time in a reply brief, the opposing party does not have an opportunity, absent seeking and being granted leave to file an additional brief, to address the issue.  Since raised for the first time in a reply brief, the equitable estoppel issue has not been fully brief and, therefore, we will not address that issue.

Hearth and Home as an additional insured.  He notes that Hearth and Home argues that it is an additional insured under the Automatic Additional Insured Endorsement to Haldeman's Penn National insurance policy.  He argues that if Hearth and Home prevails on that argument, then there is no possible breach by Haldeman of the Insurance Requirements.  As discussed below in connection with the summary judgment motions addressing Hearth and Home's counterclaims and third-party claims against Penn National, Hearth and Home is not entitled to coverage or to a defense under the Automatic Additional Insureds Endorsement to Haldeman's Penn National Policy.

Haldeman also argues that Hearth and Home was not damaged by any breach on his part in not naming Hearth and Home as an additional insured because Hearth and Home was fully insured at the time of the loss and suffered no damage as a result of the fire.  Hearth and Home responds that at the time of the fire it was self-insured for claims up to one million dollars.  We can not say as a matter of law that Hearth and Home did not suffer any damages as a result of Haldeman's failure to name him as an additional insured on his Penn National policy.

Haldeman also contends that, assuming *arguendo* that he did breach the Independent Contractor Agreement by failing to name Hearth and Home as an additional insured, Hearth and Home's measure of damages for such breach would be the insurance premium that would have been charged had Hearth and Home procured the required insurance for Haldeman prior to the fire. Haldeman cites that part of the insurance provision in the Independent Contractor Agreement that provides:

> If it is subsequently determined that work was performed without the required insurance coverage, then Company will back charge Contractor as set forth in paragraph eight (8) herein for the respective premiums due as set forth below for all work performed without the required insurance coverage. For work performed without the insurance coverage the following percentage of payments due Contractor will be back charged as reimbursement to Company for their additional insurance liability:
>
> WORKER'S COMPENSATION PREMIUM    ____%
>
> GENERAL LIABILITY PREMIUM         ____%

Although the back charge provision cited above permits the Company to back charge the Contractor for failure to obtain insurance, there is nothing in the Independent Contractor Agreement that indicates that in the event of a breach the Company's damages would be limited to back charging the Contractor. Accordingly, we reject Haldeman's argument that Hearth and Home's measure of damages for a breach would be

67

limited to the insurance premium that would have been charged
had Hearth and Home procured the required insurance for
Haldeman prior to the fire.

E. Summary.

Based on the foregoing, it will be recommended that
Haldeman's motion for summary judgment or, in the alternative,
partial summary judgment against Hearth and Home be denied and
that Hearth and Home's motion for summary judgment against
Haldeman be denied.

VI.  Hearth and Home's Motion for Summary Judgment against Penn
     National on Hearth and Home's Counterclaims/Third-Party
     Claims against Penn National and Penn National's Motion
     for Summary Judgment against Hearth and Home on Hearth and
     Home's Counterclaims/Third-Party Claims against Penn
     National.

Because the issues raised in Hearth and Home's motion
for summary judgment against Penn National on Hearth and Home's
counterclaims/third-party claims against Penn National and the
issues raised in Penn National's motion for summary judgment
against Hearth and Home on Hearth and Home's counterclaims/
third-party claims are essentially the same, we address those
motions together.

Hearth and Home's counterclaim (in the Penn National case) against Penn National and its cross-claim (in the Traveler's case) against Penn National each contain the same three counts.  Count I is a breach of contract claim.  Count II is a claim for breach of the covenant of good faith and fair dealing.  Count III requests a declaratory judgment declaring: that Penn National is under a duty to defend Hearth and Home in the action filed by Penn National as subrogee of Stoltzfus and in the action filed by Travelers Insurance as subrogee of Doneckers; that Penn National and Haldeman are required to indemnify Hearth and Home for any and all sums recovered in either the case brought by Penn National or the case brought by Travelers; and that Penn National acted in bad faith in denying Hearth and Home coverage and a defense.

A. Undisputed Facts.

The following facts are not in dispute for purposes of the motions of Penn National and Hearth and Home.

Mrs. Haldeman contacted Stephen Cover, an insurance agent with Enders Insurance Associates (Enders Insurance), and requested a general liability policy for Mr. Haldeman's fireplace business. *Statement of Material Facts by Third-Party*

*Defendant, Penn National Insurance at ¶¶3 & 6 and Defendant Hearth & Home Technologies Inc.'s Response to Third Party Defendant Penn National Insurance's Statement of Material Facts at ¶3 & 6.* Mrs. Haldeman did not ask Mr. Cover to add Hearth and Home as a named additional insured under the policy and Haldeman did not provide Hearth and Home's Insurance Requirements to Enders Insurance. *Id. at ¶¶ 7 & 8.*

Penn National issued a commercial general liability insurance policy to Howard Haldeman t/d/b/a Haldeman Chimney Sweep. *Id. at ¶1.* The Policy had effective dates of February 15, 2004 through February 15, 2005. *Id.* The Policy was in full force and effect at the time of the fire on October 1, 2004. *Defendant, Counter-Plaintiff and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts as to which There is No Genuine Issue to be Tried Filed in Support of its Motion for Summary Judgment against Penn National Insurance at ¶14 and Penn National's Response to the Statement of Material Facts Presented by Hearth & Home in its Motion for Summary Judgment at ¶14.*

The Policy provides coverage for bodily injury and property damage. *Doc. 92, Exhibit A - Section I.A.*

The Policy contains an exclusion for contractual liability which provides that "[t]his insurance does not apply to . . . "[b]odily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." *Id. at Section 1.A.2.b.*  This exclusion contains exceptions one of which provides in pertinent part that "[t]his exclusion does not apply to liability for damages . . . [a]ssumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement." *Id.*

The Policy defines "insured contract" to mean *inter alia:*

> That part of any other contract or agreement
> pertaining to your business (including an
> indemnification of a municipality in
> connection with work performed for a
> municipality) under which you assume the tort
> liability of another party to pay for "bodily
> injury" or "property damage" to a third person
> or organization.  Tort liability means a
> liability that would be imposed by law in the
> absence of any contract of agreement.

*Id. at Section V.9.f.*

The Policy contains a provision relating to the defense of an indemnitee of the insured which provides, in pertinent parts:

71

If we defend an insured against a "suit" and
an indemnitee of the insured is also named as
a party to the "suit", we will defend that
indemnitee if all of the following conditions
are met:

a.   The "suit" against the indemnitee seeks
     damages for which the insured has assumed
     the liability of the indemnitee in a
     contract or agreement that is an "insured
     contract";

b.   This insurance applies to such liability
     assumed by the insured;

c.   The obligation to defend, or the cost of
     the defense of, that indemnitee, has also
     been assumed by the insured in the same
     "insured contract";

d.   The allegations in the "suit" and the
     information we know about the
     "occurrence" are such that no conflict
     appears to exist between the interests of
     the insured and the interests of the
     indemnitee;

e.   The indemnitee and the insured ask us to
     conduct and control the defense of that
     indemnitee against such "suit" and agree
     that we can assign the same counsel to
     defend the insured and the indemnitee;
     and

f.   The indemnitee . . . [a]grees in writing
     to [cooperate and provide certain
     information to the insurer]

*Id. at Section I - Supplemental Payments -Coverages A and B at*

*¶2.*

The Policy contains an endorsement which contains a

section entitled "Unintentional Errors or Omissions" and which

provides: "We will not deny coverage under this Coverage Part

because of the unintentional omission of, or unintentional

error in, any information provided by you.  However, this

72

provision does not affect our right to collect additional

premium or exercise our right of cancellation or non-renewal."

*Id. at Extended Coverage Endorsement General Liability at*

*¶VIII.*


The Policy contains an endorsement entitled "Automatic

Additional Insureds – Owners, Contractors and Subcontractors."

This endorsement adds the following provision to the Section of

the Policy entitled "Who is an Insured" and provides, in

pertinent part:

> Any person(s) or organization(s) (referred to
> below as "additional insured") with whom you
> are required in a written contract or
> agreement to name as an additional insured but
> only for "your" acts or omissions arising from
> "your" ongoing operations at the location or
> project described in the contract or
> agreement.
>
> The insurance provided to the additional
> insured does not apply to "bodily injury",
> "property damage", "personal and advertising
> injury":
> a.   Arising out of any act or omission of the
>      additional insured(s) or any of their
>      "employees", including supervision of
>      "your work" or the work of any other
>      person or organization.
> b.   Occurring after that portion of "your
>      work" out of which the injury or damage
>      arises has been put to its intended use
>      by any person or organization other than
>      another contractor or subcontractor
>      engaged in performing operations for a
>      principal as a part of the same project.
>
> . . .

73

> These exclusions apply in addition to those
> contained in the Coverage Part.
>
> . . .
>
> This coverage does not apply to any
> person(s) or organization(s) specifically
> named as additional insured in any policy
> issued by "us".

*Id. at Endorsement entitled Automatic Additional Insureds –*
*Owners, Contractors and Subcontractors.*

The Policy does not list a named additional insured and
the only named insured is Howard Haldeman. *Statement of*
*Material Facts by Third-Party Defendant, Penn National*
*Insurance at ¶2 and Defendant Hearth & Home Technologies Inc.'s*
*Response to Third Party Defendant Penn National Insurance's*
*Statement of Material Facts at ¶2.* On February 26, 2004 a
Certificate of Insurance was produced by Enders Insurance which
lists Fireside Hearth & Home as a certificate holder. *Id. at*
*¶9.* Enders Insurance indicated that Hearth & Home is not a
named additional insured on the Haldeman Policy by placing a
letter "N" in the box next to the words "additional insured."
*Id. at ¶10.*

Hearth and Home made a claim for coverage for the
claims made on behalf of Stoltzfus and Doneckers for the damage
to their respective property as a result of the fire. *Id. at*

¶22.   Penn Nation denied Hearth and Home's request for a defense and indemnification under the Policy.  *Defendant, Counter-Plaintiff and Third-Party Plaintiff Hearth & Home Technologies Inc.'s Statement of Material Facts as to which There is No Genuine Issue to be Tried Filed in Support of its Motion for Summary Judgment against Penn National Insurance at ¶¶58 & 59 and Penn National's Response to the Statement of Material Facts Presented by Hearth & Home in its Motion for Summary Judgment at ¶¶58 & 59.*

B. Standards for Interpreting an Insurance Policy.

Under Pennsylvania law, the interpretation of an insurance contract is a question of law. *401 Fourth St., Inc. v. Investors Ins. Group,* 879 A.2d 166, 170 (Pa. 2005).  The task of interpreting an insurance contract is generally performed by the court rather than a jury, and "[t]he purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Id.* at 171.  "When the language of the policy is clear and unambiguous, a court is required to give effect to that language." *Id.*  "Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist." *Sikirica v.*

*Nationwide Ins. Co.,* 416 F.3d 214, 220 (3d Cir. 2005).  "After determining the scope of coverage under a policy, the court must examine the complaint in the underlying action to determine whether it triggers coverage." *Id.* at 226.

"The duty to defend is a distinct obligation, different from and broader than the duty to indemnify." *Sikirica*, *supra,* 416 F.3d at 225.  The duty to defend arises whenever the underlying complaint may potentially come within the insurance coverage. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.,* 193 F.3d 742, 746 (3d Cir. 1999). "Furthermore, if a single claim in a multiclaim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim." *Id.* "It follows that there may be a duty to defend without a duty to indemnify." *Id.*  However, "[b]ecause the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend." *Sikirica*, *supra,* 416 F.3d at 225.  The insurer's duty to defend is determined solely by the allegations in the underlying complaint. *Visiting Nurse Ass'n v. St. Paul Fire & Marine Ins.,* 65 F.3d 1097, 1100 (3d Cir. 1995).  "In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in

76

favor of the insured." *Frog, Switch, supra.,* 193 F.3d at 746.
"Any doubts regarding the insurer's duty to defend must be
resolved in favor of the insured."  *Western World Ins. Co. v.*
*Reliance Ins. Co.,* 892 F.Supp. 659, 662 (M.D.Pa. 1995).
"However, the particular cause of action that a complainant
pleads is not determinative of whether coverage has been
triggered." *Erie Ins. Exchange v. Muff,* 851 A.2d 919, 926
(Pa.Super.Ct. 2004).  "Instead it is necessary to look at the
factual allegations contained in the complaint." *Id.*


        "[C]overage clauses are interpreted broadly so as to
afford the greatest possible protection to the insured."
*Eichelberger v. Warner*, 434 A.2d 747, 750 (Pa.Super.Ct. 1981).
On the other hand, exceptions to an insurer's general liability
are interpreted narrowly against the insurer. *Id.*


C. Discussion.


        1. Named Insured.


        Penn National contends that Hearth and Home can not
enforce the terms of the policy because it was not a named
additional insured on the policy.

It is not disputed that the Policy does not list a named additional insured and the only named insured is Howard Haldeman. It is also not disputed that on February 26, 2004 a Certificate of Insurance was produced by Enders Insurance which lists Fireside Hearth & Home as a certificate holder, and that Enders Insurance indicated that Hearth & Home is not a named additional insured on the Haldeman Policy by placing a letter "N" in the box next to the words "additional insured."

Despite the above facts not being in dispute, Hearth and Home still suggests that it was a named additional insured. Hearth and Home points to the Insurance Requirements, which it contends were a part of the Independent Contractor Agreement. A provision of the Insurance Requirements provide that "[a]ll policies of insurance, except Workers' Compensation, obtained by the Contractor in accordance with these requirements, shall name Thulman Eastern Corporation as an Additional Insured." *Doc. 101, Exhibit 8.*  As discussed above, there is a material factual dispute about whether the Insurance Requirements were part of the Independent Contractor Agreement signed by Haldeman.  Nevertheless, even assuming *arguendo* that the Insurance Requirements were part of the Independent Contractor Agreement, that does not mean that Hearth and Home was actually a named additional insured on the Penn National Policy.

78

In support of its suggestion that it was a named additional insured on the Penn National policy, Hearth and Home points to the deposition testimony of Stephen Cover, Haldeman's insurance agent.  Hearth and Home admits that Cover testified that he did not receive Hearth and Home's Insurance Requirements from Haldeman. *Doc. 93 at 65.*  Hearth and Home asserts, however, that Cover also testified: that it was his usual practice to ask to see a potential new customer's contract with a person who hired him and that he would want to know what the insurance requirements were that would need to be fulfilled; that he did not recall whether he asked the Haldemans if they needed anyone else to be listed as an additional insured; and that he did not ask the Haldemans if they needed to name anybody as an additional insured.  Cover's testimony does not create a dispute as to the fact that Hearth and Home was not named as an additional insured on the Penn National policy.

In support of its suggestion that it was a named additional insured on the Penn National policy, Hearth and Home also points to the deposition testimony of Haldeman. *Doc. 93 at 66.*  Hearth and Home asserts that Haldeman testified that it was his belief that he had complied with the insurance requirements specified in the Independent Contractor Agreement.

79

*Id.* However, as discussed above, Haldeman states that when he signed the Independent Contractor Agreement he knew that he had to get and pay for general liability insurance with a one million dollar limit, but he disputes that the Insurance Requirements were given to him as part of the Independent Contractor Agreement. *Haldeman Affidavit (Doc. 84, Exhibit E) at ¶20.* Haldeman's testimony does not create a dispute as to the fact that Hearth and Home was not named as an additional insured on the Penn National policy.

In support of its suggestion that it was a named additional insured on the Penn National policy, Hearth and Home points to the Certificate of Insurance that it received. Hearth and Home does not dispute that the Certificate of Insurance had a "N" next to the box labeled "Additional Insured." However, Hearth and Home asserts that the copy of the Certificate of Insurance that it received had been sent to it by facsimile transmission and it was difficult to discern whether it was an "N" or an "X" in the box next to the word "additional insured." Hearth and Home also points out that the typed notation "FIRESID" appeared directly below the typed language "ADDITIONAL INSURED; INSURER LETTER: __" on the Certificate of Insurance. In connection with the motions relating to Haldeman discussed above, Hearth and Home argues that it was led to

80

believe that it had been named as an additional insured under the policy.  However, the Certificate provides that it is issued as a matter of information only and that it does not alter the coverage provided by the policy. *Doc. 84, Exhibit P.* Thus, whether or not Hearth and Home was misled by the Certificate of Insurance, the fact that Hearth and Home was not a named additional insured on the Policy is undisputed.

We conclude that Hearth and Home is not a named additional insured under the Policy.  That conclusion, however, does not end the inquiry as to whether Hearth and Home is entitled to a defense and/or indemnity under the Policy on the basis, as Hearth and Home argues, that it is entitled to coverage under the policy as an indemnitee of Haldeman, that it is an additional insured under the Automatic Additional Insured Endorsement, and that it is entitled to the status of an additional insured under the Unintentional Errors or Omissions provision in the policy.  We address those arguments below.

2. Indemnitee under an Insured Contract.

Hearth and Home contends that it is entitled to coverage and damages for defense expenses under the Policy because it is an indemnitee of Haldeman.

The contractual liability exclusion of the Policy contains an exception that provides that the "exclusion does not apply to liability for damages . . . [a]ssumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement."  The Policy defines "insured contract" to mean *inter alia:*

> That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract of agreement.

*Doc. 92, Exhibit A - Section V.9.f.*

Hearth and Home argues that the Independent Contractor Agreement is an "insured contract" under the Policy and that the indemnity provision of the Independent Contractor Agreement requires Haldeman to indemnify it as long as the damage from the fire was the direct or indirect result of work Haldeman had contracted to perform.  Hearth and Home suggests that because it is an indemnitee of Haldeman it is entitled to coverage for damages and defense expenses under the Policy.

We agree that the indemnity provision of the Independent Contractor Agreement is an "insured contract" under the Policy.  As discussed above in connection with the motions regarding Haldeman and Hearth and Home's claims against each other, the indemnity provision of the Independent Contractor Agreement can not be construed to indemnify Hearth and Home for Hearth and Home's own negligence.  Nevertheless, the indemnity provision of the Independent Contractor Agreement requires Haldeman to indemnify Hearth and Home for Haldeman's negligence.  Thus, the indemnity provision of the Independent Contractor Agreement is an "insured contract" under the Policy.

Although the indemnity provision of the Independent Contractor Agreement is an "insured contract," Hearth and Home is, nevertheless, not entitled to coverage and/or a defense under the "insured contract" exception to the contractual liability exclusion in the Policy.  Haldeman, as the named insured, is entitled to coverage and a defense for claims that fall within the "insured contract" exception to the contractual liability exclusion of the Policy.  However unless Hearth and Home is an additional insured under the Policy it is not entitled to coverage and a defense for claims that fall within the "insured contract" exception to the contractual liability exclusion of the Policy.  As discussed above, we have concluded

that Hearth and Home is not a named additional insured on the Policy.  We discuss below  whether Hearth and Home is an additional insured under the Automatic Additional Insured Endorsement of the Policy.

The Policy contains a provision relating to the defense of an indemnitee of the insured which provides that if Penn National defends an insured against a suit and an indemnitee of the insured is also named as a party to the suit Penn National will defend the indemnitee provided that certain conditions are met.

Penn National argues that Hearth and Home is not entitled to a defense under this provision because certain conditions of the provision are not met in this case.

Condition (d) of the provision providing a defense for an indemnitee provides that "[t]he allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee."  Penn National argues that this condition is not met in this case because there is a conflict of interest between Haldeman and Hearth and Home.  We agree.

84

In the Travelers case, both Haldeman and Hearth and Home were named as defendants and both parties filed cross claims against each other for contribution and indemnification. Further, in the Penn National case Hearth and Home filed a third-party complaint against Haldeman for contribution, indemnification and breach of contract.  Moreover, Haldeman's expert blames the fire on Hearth and Home, and Hearth and Home contends that Haldeman was responsible for the installation and is at fault if the fire was caused by faulty installation of the fireplace.  There exists a conflict between the interests of Haldeman and Hearth and Home.  Accordingly, Hearth and Home is not entitled to a defense under the Policy pursuant to the provision of the policy relating to the defense of an indemnitee of the insured.

Hearth and Home argues that Penn National created any conflict that exists and that, therefore, the court should not conclude that it is not entitled to a defense under the Policy on the basis that condition (d) is not met.  Hearth and Home's argument that any conflict of interest was created by Penn National is based on the fact that Penn Nation commenced this action as subrogee of Stoltzfus and the fact that Penn National also represents the interests of Haldeman under the Haldeman

Policy.  Hearth and Home asserts that Penn National controls every party in this case except Hearth and Home and Travelers.

The conflict of interest that is present here as between Haldeman and Hearth and Home is not the result of the several hats worn by Penn National in this litigation.  Rather, it is present because both Hearth and Home and Haldeman have been sued in the Travelers case and because in both the Travelers case and the Penn National case Hearth and Home and Haldeman are blaming each other for the fire.

Condition (d) is not met in this case because there is a conflict of interest between Haldeman and Hearth and Home. Therefore, Hearth and Home is not entitled to a defense by Penn National pursuant to the provision in the Policy relating to the defense of an indemnitee.[8]

---

[8] Penn National also argues that condition (a) of the provision in the Policy relating to the defense of an indemnitee is also not met in this case.  Because we have concluded that condition (d) is not met there is no need to consider whether or not condition (a) is met.

3. Automatic Additional Insured Endorsement.

Hearth and Home contends that it is covered under the Policy as an additional insured pursuant to the Endorsement to the Policy regarding Automatic Additional Insureds.

The Endorsement regarding Automatic Additional Insureds amends the Section of the Policy entitled "Who is an Insured" and provides, in pertinent part:

> Any person(s) or organization(s) (referred to below as "additional insured") with whom you are required in a written contract or agreement to name as an additional insured but only for "your" acts or omissions arising from "your" ongoing operations at the location or project described in the contract or agreement.
>
> The insurance provided to the additional insured does not apply to "bodily injury", "property damage", "personal and advertising injury":
> a.   Arising out of any act or omission of the additional insured(s) or any of their "employees", including supervision of "your work" or the work of any other person or organization.
> b.   Occurring after that portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

87

Hearth and Home argues that it is an additional insured under the Endorsement because, pursuant to the Insurance Requirements of the Independent Contractor Agreement, Haldeman was required to name it as an additional insured.  As discussed in connection with the motions regarding Haldeman, there is a genuine factual dispute as to whether the Insurance Requirements were a part of the Independent Contractor Agreement signed by Haldeman.

Regardless of whether or not Hearth and Home qualifies as an additional insured under the Endorsement, Penn National argues, two of the exclusions to the coverage provided to additional insureds under the Endorsement apply in this case.

Exclusion (a) of the Endorsement provides that "[t]he insurance provided to the additional insured does not apply to . . . "property damage" . . . [a]rising out of any act or omission of the additional insured(s) or any of their "employees", including supervision of "your work" or the work of any other person or organization."

Penn National suggests that Exclusion (a) of the Endorsement applies because it, as the subrogee of Stoltzfus, and Travelers, as subrogee of Doneckers, allege negligence on

the part of Hearth and Home apart from any negligence on the part of Haldeman.  Although the complaints in both cases can be read to allege negligence on the part of Hearth and Home independent from Haldeman, both complaints can also be construed to allege negligence on the part of Hearth and Home based on the acts of its agents.  As discussed above, there is a question of fact whether Haldeman was an independent contractor or an employee of Hearth and Home.  Also, as discussed above, there is a material question of fact about the cause of the fire.  Given these factual disputes, we can not determine as a matter of law whether Exclusion (a) of the Endorsement applies.

Exclusion (b) of the Endorsement provides that "[t]he insurance provided to the additional insured does not apply to . . . "property damage" . . . [o]ccurring after that portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project."

Penn National argues that Exclusion (b) of the Endorsement applies because Haldeman's work was put to its intended use when Hearth and Home turned the fireplace over to

Stoltzfus and it was used by Stoltzfus.  Hearth and Home, on the other hand, argues that Exclusion (b) does not apply because the home in which the fireplace was installed had not yet been sold and put to its intended use as a dwelling.  We reject this argument.

Exclusion (b) applies to property damage "[o]ccurring after that portion of "your work" out of which the injury or damage arises has been put to its intended use . . . ."  The Policy indicates that the terms "you" and "your" refer to the named insured.  *Doc. 92, Exhibit A - Introductory Paragraph to Commercial General Liability Coverage Form.*  The phrase "your work" is defined in the Policy to mean: "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations."  *Id. at Section V.22.a.*  Thus, it is Haldeman's work that is being referred to as "your work" in the exclusion and the question is whether Haldeman's work, not the entire home, was put to its intended use.  Therefore, the fact that the home was not yet sold is not material to the question whether Exclusion (b) applies.

Hearth and Home also argues that, even if the fireplace was considered to have been put to its intended use, Exclusion

90

(b) of the Endorsement does not apply because the fireplace was put to use by another contractor.  Hearth and Home contends that the property had been turned over to a real estate agent, who was an independent contractor of Stoltzfus, to conduct showings in an attempt to sell the property and that, therefore Exclusion (b) does not apply.  Again, we reject this argument.

Exclusion (b) applies to property damage occurring after that portion of the named insured's work out of which the injury or damage arises "has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project."  The term "same project" is not specifically defined in the Endorsement or Policy.  The Endorsement provides that an additional insured is a person or organization who[9] the named insured is "required in a written contract or agreement to name as an additional insured but only for "your" acts or omissions arising from "your" ongoing operations at the location or project described in the contract or agreement."  It is clear from that provision that the project is the project described in the contract or agreement. We think that the term "same project" in Exclusion (b) refers

---

[9] The Endorsement uses awkward phrasing: "with whom you are required . . . to name as an additional insured . . ."

back to that definition of project.  The contract or agreement
in this case is the Independent Contractor Agreement which
deals with the installation of fireplaces.  Thus, we conclude
that the term "same project" in Exclusion (b) refers to the
installation of the fireplace.  Therefore, Stoltzfus' real
estate agent does not qualify as "another contractor or
subcontractor" under Exclusion (b) and the fact that the home
was turned over to a real estate agent and had not yet sold is
not material to the question whether Exclusion (b) applies.

It is not in dispute that the fire occurred after the
fireplace had been lit.  Thus, Haldeman's work, i.e. the
installation of the fireplace, had been put to its intended
use.  Accordingly, we conclude that Exclusion (b) of the
Endorsement applies and, therefore, Hearth and Home is not
entitled to coverage or a defense under the  Automatic
Additional Insureds Endorsement.

4. Unintentional Errors or Omissions.

Hearth and Home argues that it is covered as an
additional insured under the "Unintentional Errors or
Omissions" provision in the policy which provides: "We will not
deny coverage under this Coverage Part because of the

unintentional omission of, or unintentional error in, any
information provided by you."   Hearth and Home argues that had
Haldeman informed his insurance agent of the Insurance
Requirements of the Independent Contractor Agreement the agent
would have presumably added a specific additional insured
endorsement providing the required scope of coverage.   Hearth
and Home asserts that additional insured endorsements that
specifically included coverage for injury or damage arising out
of work that was completed and put to its intended use were
available and being used by insurers prior to the date of the
fire.

Penn National argues that the "Unintentional Errors or
Omissions" provision, which is found in an Endorsement,
modifies the insurance provided the named insured under the
"Commercial General Liability Coverage Form."   Therefore, Penn
National argues, Hearth and Home is not covered by operation of
the "Unintentional Errors or Omissions" provision.   We agree
with Penn National.   The "Unintentional Errors or Omissions"
provision can not be reasonably construed to extend coverage to
an entity which is not named in the policy and which does not
otherwise qualify for coverage or for a defense under the
Policy.

5.  Bad Faith.


Hearth and Home contends that Penn National acted in bad faith by failing to adequately investigate the facts surrounding the fire and by refusing to defend Hearth and Home despite the existence of facts indicating potential coverage. Penn National contends that Hearth and Home does not have standing to bring a bad faith claim and that, in any event, it did not act in bad faith.


Pennsylvania's Bad Faith Statute, 42 Pa.C.S.A. § 8371, provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

"Bad faith" is not defined in the statute.  The Pennsylvania Superior Court has defined "bad faith" as "'any frivolous or unfounded refusal to pay proceeds of a policy.'"

94

*Terletsky v. Prudential Property and Cas. Ins. Co.*, 649 A.2d
680, 688 (1994)(quoting *Black's Law Dictionary* 139 (6th ed.
1990)).  "To make out a claim of bad faith, a plaintiff must
show by clear and convincing evidence that the insurer (1) did
not have a reasonable basis for denying benefits under the
policy; and (2) knew or recklessly disregarded its lack of
reasonable basis in denying the claim." *W.V. Realty, Inc. V.
Northern Ins. Co.,* 334 F.3d 306, 312 (3d Cir. 2003).


    As discussed above, Hearth and Home is not a named
additional insured, is not entitled to a defense under the
provision of the Policy providing a defense to an indemnitee of
the insured if certain conditions are met, and is not an
additional insured under the Automatic Additional Insureds
Endorsement.  Therefore, we agree with Penn National that
Hearth and Home does not have standing to bring a bad faith
claim and that, in any event, Penn National did not act in bad
faith.

D. Summary.

    Based on the foregoing, it will be recommended that
Hearth and Home's motion for summary judgment against Penn
National on Hearth and Home's counterclaims/third-party claims

against Penn National be denied and that Penn National's motion
for summary judgment on Hearth and Home's counterclaims/third-
party claims be granted.

VII.   Recommendations.

        Based on the foregoing, it is recommended that
Travelers' motion (doc. 67) for partial summary judgment
against Hearth and Home be denied, that Penn National's motion
(doc. 62) for summary judgment against Hearth and Home on its
claims as the subrogee of Stoltzfus against Hearth and Home be
denied, that Haldeman's motion (doc. 64) for summary judgment
or, in the alternative, partial summary judgment against Hearth
and Home be denied, that Hearth and Home's motion (doc. 70) for
summary judgment against Haldeman be denied, that Hearth and
Home's motion (doc. 73) for summary judgment against Penn
National on Hearth and Home's counterclaims/ third-party claims
against Penn National be denied, and that Penn National's
motion (doc. 76) for summary judgment against Hearth and Home

on Hearth and Home's counterclaims/third-party claims against

Penn National be granted.

                                        */s/ J. Andrew Smyser*
                                        J. Andrew Smyser
                                        Magistrate Judge

Dated:   February 9, 2007.